1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAROD MORRIS,

                      Plaintiff,

        v.

BNSF RAILWAY COMPANY,

                      Defendant.

CASE NO. 3:23-cv-05059-DGE

ORDER ON MOTION FOR
SUMMARY JUDGMENT (DKT.
NO. 61) AND MOTION TO
EXCLUDE (DKT. NO. 63)

## I    INTRODUCTION

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 61) and Defendant's motion to exclude Plaintiff's experts (Dkt. No. 63).  For the foregoing reasons, the motion for summary judgement is DENIED.  The motion to exclude is GRANTED IN PART and DENIED IN PART.

## II    BACKGROUND

### A.  Facts

1    Plaintiff Jarod Morris was hired as a maintenance-of-way section man at Defendant

2  BNSF Railway Company ("BNSF") in May of 2011.  (Dkt. No. 68-1 at 4.)  Initially, his job

3  included digging out trenches, moving ballast (rock), and moving tires.  (*Id*. at 5.)  As Plaintiff

4  advanced in seniority and transferred between various work crews on the railroad, he was also

5  assigned to operate heavy machinery, including a "spiker" (a spike driving machine), a speed

6  swing, and a swing loader.  (*Id*. at 7–16.)  Between 2015 and 2020, much of Plaintiff's job

7  involved dumping ballast around railroad tracks.  (*Id*. at 15.)  In order to dump ballast, Plaintiff

8  was assigned to drive along the tracks in a swing loader that was connected to a "rock car" (i.e., a

9  rail car filled with ballast) by a fixed piece of cast iron.  (*Id*.)  Plaintiff traveled at approximately

10  1.5 miles per hour dumping rock progressively out of the holes at the bottom of the rock car.  (*Id*.

11  at 16.)  When the supply of ballast grew low, Defendant instructed Plaintiff to speed up the

12  swing loader to approximately 3-4 miles per hour and then slam on the breaks, causing the

13  railcar to rearend the swing loader, creating a "jarring motion to knock the rock loose."  (*Id*.)

14  Plaintiff stated that "at the end of the day [of dumping ballast using this method] your body is

15  just real stiff, and you're in, you know—most times you're in pain."  (*Id*. at 18.)

16    Although Plaintiff experienced back pain during the years he worked dumping ballast

17  using the rearending method, he believed the pain was not serious in nature and would go away.

18  (Dkt. No. 68-2 at 3) ("I'd be like, oh man, this—this one hurt pretty good when I got slammed,

19  you know, and just move on with it.").  He did not consult a doctor because "unless [he is]

20  bleeding or got bones sticking out, [he will] not go[] to the doctor."  (*Id*.)

21    On February 3, 2020, Plaintiff noticed that the swing loader's tire was low on air, so he

22  retrieved an air hose to reinflate the tire.  (Dkt. No. 68-1 at 20.)  He bent over for approximately

23  fifteen minutes to fill the tire and when he stood back up, he heard an audible "pop" in his back

24

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 61) AND MOTION TO EXCLUDE (DKT.
NO. 63) - 2

and experienced acute pain that dropped him to his knees.  (*Id.*)  He was taken to the emergency department and ultimately diagnosed with lumbar sprain and then lumbar disc herniation at L2-3 and spondylolisthesis at level L5-S1.  (Dkt. No. 68-8 at 2.)  For the four days prior to the incident, he was dumping ballast more than usual and repeatedly rearended by the rock cart. (*Id.*)

## B.  Procedural History

On January 23, 2023, Plaintiff filed a complaint alleging a violation of the Federal Employer's Liability Act ("FELA"), 45 U.S.C. 51 et. seq.  (Dkt. No. 1 at 2–3.)  Defendant filed an answer on April 19, 2023, and the litigation proceeded through the discovery process.  (*See* Dkt. No. 20.)  On April 15, 2025, Defendant moved for summary judgment and to exclude Plaintiff's three expert witnesses.  (Dkt. Nos. 61, 63.)  These motions are now ripe for disposition.  The Court first considers the motion to exclude and then the motion for summary judgment.

## III    MOTION TO EXCLUDE

### A.  Legal Standard

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the

1                facts of the case.

2   "Before admitting expert testimony into evidence, the district court must perform a gatekeeping

3   role of ensuring that the testimony is both relevant and reliable under Rule 702." *United States*

4   *v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation marks omitted)

5   (quoting *Daubert*, 509 U.S. at 597). This requires the court to determine if the expert's

6   reasoning or methodology underlying the testimony: (1) is scientifically valid (i.e. reliable); and

7   (2) can be applied to the facts at issue (i.e. relevant). *Daubert*, 509 U.S. at 592–593.

8           The reliability inquiry "requires that the expert's testimony have a reliable basis in the

9   knowledge and experience of the relevant discipline." *Ruvalcaba-Garcia*, 923 F.3d. at 1188–

10   1189 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

11   149 (1999)). In *Daubert*, the Supreme Court set out several factors that courts may consider in

12   determining reliability: "(1) whether a scientific theory or technique can be (and has been) tested;

13   (2) whether the theory or technique has been subjected to peer review and publication; (3) the

14   known or potential rate of error and the existence and maintenance of standards controlling the

15   techniques operation; and (4) whether the technique is generally accepted." *Neal-Lomax v. Las*

16   *Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1193, 1201 (D. Nev. 2008), *aff'd*, 371 F. App'x 752

17   (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 593–94). "The inquiry under Rule 702 is a 'flexible'

18   one, and the district court has 'the discretionary authority . . . to determine reliability in light of

19   the particular facts and circumstances of the particular case.'" *Youngevity Int'l v. Smith*, No. 16-

20   CV-704-BTM-JLB, 2019 WL 2918161, at *12 (S.D. Cal. July 5, 2019) (quoting *Kumho Tire*,

21   526 U.S. at 158); *see also Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1017

22   (9th Cir. 2004) ("[A] trial court not only has broad latitude in determining whether an expert's

23

24

1   testimony is reliable, but also in deciding how to determine the testimony's reliability." (internal

2   quotations omitted)).

3          "Expert opinion testimony is relevant if the knowledge underlying it has a valid

4   connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)

5   (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).  In other

6   words, expert opinion is relevant if it will help the trier of fact determine a fact in issue.

7   *Daubert*, 509 U.S. at 591.  "Reliable expert testimony need only be relevant, and need not

8   establish every element that the plaintiff must prove, in order to be admissible." *Id*. (citing

9   *Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007)).  Additionally, the party

10  seeking to introduce expert testimony evidence must show by a preponderance of the evidence

11  that the testimony is admissible under Rule 702.

12      **B.  Discussion**

13          1.  <u>Dr. Kevin Trangle</u>

14          Dr. Trangle is a physician with board certifications in Internal Medicine and

15  Occupational and Environmental Medicine.  (Dkt. No. 68-8 at 31.)  He submitted an expert

16  report based on a physical examination of Plaintiff and an extensive review of Plaintiff's medical

17  records and history.[1]  (*Id*. at 24.)  Dr. Trangle's report evaluates Plaintiff's injuries and opines on

18

19  ───────────────

    [1] Dr. Trangle reviewed the following records for his report: BNSF Railroad occupational

20  assessment document packet dated 02/28/2011; Todd Berinstein, M.D., ENT office records from
    01/10/2012 and 08/22/2012; Abdominal and pelvic CT report from 09/20/2014; Peace Health

21  Southwest Medical Center ED records including provider progress notes, laboratory results, and
    radiology reports from 12/10/2017 to 11/19/2023; Abdominal and pelvic CT report from

22  12/10/2017; Lumbar spine x-rays from 02/03/2020; Providence occupational health office notes
    from 02/11/2020 to 12/03/2020; Proactive physical therapy notes from 06/02/2020 to

23  04/12/2021; Rebound neurology office noted from 07/10/2020 to 07/01/2022; Abdominal RUQ
    ultrasound report from 04/28/2021; Rebound physical therapy report from 06/22/2021; EKG

24  reports from 10/14/2021 to 11/19/2023; Right-sided decompression L5-S1, transforaminal
    lumbar interbody fusion report 10/19/2021; The Hartford attending provider statements from

1    the cause of his injuries.  (*Id*. at 27–30.)  Dr. Trangle finds Plaintiff suffered from: lumbar sprain,

2    lumbar disc herniation with extrusion, aggravation of pre-existing previously asymptomatic

3    spondylolysis, spondylolisthesis, degenerative disc disease ("DDD"), and post-operative seroma

4    or bursal cyst.  (*Id*. at 27.)  Plaintiff's underlaying lumbar spondylolysis, spondylolisthesis and

5    DDD "were substantially aggravated by the rock cart repetitive collisions," Dr. Trangle

6    concludes.  (*Id*. at 25.)  Noting that Plaintiff "began having onset of back pain," after "repeatedly

7    rearend[ing] his machine into a 'rock cart' for the purposes of dislodging ballast," Dr. Trangle

8    surmises that the "[t]he tire episode placed additional forces on the supporting structures of

9    lumbar spine while kneeling, and exerted compressive forces on lumbar intervertebral discs and

10   posterior elements as he stood up and extended his spine."  (*Id*. at 25.)  "This particular

11   maneuver led to the disc extrusion," Dr. Trangle states.  (*Id*.)  Dr. Trangle concludes "Mr. Morris

12   has permanent physical functional impairment stemming from his lumbar spine injuries . . . . He

13   will continue to experience significant pain, dysfunction, and impairment with disruption of his

14   ability to perform activities of daily living."  (*Id*.)

15        Defendant argues: "Dr. Trangle is an internal medicine provider (or primary care

16   provider) and does not have the requisite education, training or experience to provide testimony

17   concerning orthopedic or neurosurgical injuries and medical care."  (Dkt. No. 63 at 9.)  Thus,

18   "[p]ursuant to the applicable law, Dr. Trangle cannot provide testimony outside the scope of his

19

20   01/19/2022 to 04/15/2022; People's injury network northwest physical therapy records from
     12/21/2021 to 04/27/2022; The Hartford medical record release forms from 02/09/2022 to

21   04/11/2022; Railroad enrollment services extension of benefits application from 03/21/2022 to
     03/25/2022; USA Railroad retirement board supplemental doctors' statement (Form SI-7) dated

22   05/26/2022; USA Railroad retirement board medical statement (Form G-250) dated 05/26/2022;
     Chest CTA reports from 03/27/2023 to 11/19/2023; Peace Health Southwest Medical Center

23   inpatient observation records including provider progress notes, laboratory results, and radiology
     reports from 06/06/2023 to 06/07/2023; Chest, abdomen, and pelvic CTA report from

24   06/06/2023.

1   practice," Defendant states.  (*Id*. at 10.)  However, Defendant fails to cite authority holding a

2   court may strike a doctor's testimony because the doctor practices in a different specialty from

3   the area about which they are testifying.  Indeed, the law is to the contrary.  For example, in *Doe*

4   *v. Cutter Biological, Inc*., 971 F.2d 375, 385 (9th Cir. 1992), the Ninth Circuit found that the trial

5   court erred when it excluded affidavits from doctors who were not specifically licensed in

6   hematology, stating that did "not mean that they were testifying beyond their area of expertise."

7   *Id*.  The *Cutter* court commented that courts "impose no requirement that an expert be a

8   specialist in a given field" and "[l]icensure in the discipline or specialty which is the subject of

9   expert opinion is not a requirement under the Federal Rules of Evidence."  *Id*.

10          Moreover, in this case, Dr. Trangle *does* have significant clinical experience treating

11   orthopedic injuries.  During his career, he spent five years practicing as an emergency room

12   doctor, worked for four years as the Director of Occupational Medicine at Mt. Sinai Medical

13   Center in Cleveland Ohio, worked for three years at University Orthopedics at Chagrin

14   Highlands managing non-operative orthopedic patients, and ran an outpatient occupational

15   medicine practice in Seattle, Washington focused on orthopedic injury care.  (68-8 at 36–38.)  "A

16   medical expert 'certainly may rely on his own clinical experience in stating his opinion.'"

17   *Bordelon v. Airgas USA, LLC*, 603 F. Supp. 3d 946, 955 (D. Or. 2022) (quoting *McClellan v. I-*

18   *Flow Corp*., 710 F. Supp. 2d 1092, 1138 (D. Or. 2010)).  Significant caselaw supports the

19   conclusion that Dr. Trangle's report represents a "relevant opinion offered with sufficient

20   foundation by one qualified to give it."  *Primiano v. Cook*, 598 F.3d 568 (9th Cir. 2010), as

21   amended (Apr. 27, 2010).  The fact that Dr. Trangle is not an orthopedic surgeon does not affect

22   his opinion's admissibility, but rather the weight the jury may ultimately afford it.  The Court

23   will deny the motion as to Dr. Trangle's report.

24

1          2.  Dr. Wilson Hayes

2          Dr. Wilson Hayes holds a B.S. in Mechanical Engineering, an M.S. in Mechanical

3  Engineering, and a Ph.D. in Theoretical and Applied Mechanics (Biomedical Engineering).

4  (Dkt. No. 68-9 at 4.)  Hayes has served as an Assistant Professor of Mechanical Engineering and

5  Surgery (Orthopedics) at Stanford University, as an Associate Professor of Orthopedics and

6  Bioengineering at the University of Pennsylvania, as the Director of the Orthopedic

7  Biomechanics Laboratory at Boston's Beth Israel Hospital, as an Associate Professor of

8  Orthopedic Surgery at Harvard Medical School, as an Associate Professor of Orthopedic Surgery

9  at the Harvard-MIT Division of Health Sciences and Technology, and as a full Professor at

10  Harvard Medical School, MIT, Oregon State University, and Oregon Health & Science

11  University.  (*Id*. at 5.)

12          Hayes' report opines on the biomechanical mechanism and cause of Plaintiff's injury.

13  (*Id*. at 44.)  Hayes concludes that the acute injury to Plaintiff's lower back was "caused directly

14  by the air-filling task."  (*Id*. at 59.)  "This [injurious] effect was further amplified

15  by . . . reductions in the disc tolerance from his multi-year exposure to Whole-Body Vibration

16  and Shock ['WBV+S']" from rearending his machine into a rock cart, Hayes determines.  (*Id*. at

17  75.)  The report states: "[t]he acute injury sustained on February 3, 2020, met all four of the

18  requirements for biomechanical causation" in that there was: a scientifically reliable

19  biomechanical mechanism, "objective evidence of acute injury . . . and evidence of accumulation

20  of distributed annular fissures typical of chronic damage from WBV+S," and appropriate timing

21  of symptom onset.  (*Id*. at 75.)  The report further concludes: "the daily WBV+S to which Jarod

22  Morris was exposed was both a direct and a substantially contributing cause to his acute injuries

23  on February 3, 2020, and to the accumulated damage to the intervertebral disc as evidenced by

24

1  both by an acute disc extrusion and fissures to the annulus fibrosis, both demonstrated

2  objectively by MRI."  (*Id.*)

3       Defendants seek to exclude Dr. Hayes' report for a number of reasons: 1) "Dr. Hayes is

4  not a medical doctor and cannot provide testimony concerning causation of medical injuries"; 2)

5  "Dr. Hayes failed to follow a scientific methodology" and "has neither conducted research nor

6  published in the field of whole-body vibration outside of litigation"; and 3) Dr. Hayes

7  impermissibly opines on legal questions of causation.  (*Id*. at 5–8.)

8       As for Defendant's first argument, there is no rule that qualified biomechanical experts

9  may not offer opinions on specific causation.  *See Allen v. State Farm Mut. Auto. Ins. Co*., No.

10  3:15-CV-0019-HRH, 2016 WL 9086966, *4 (D. Alaska Aug. 2, 2016) (collecting cases that hold

11  a medical degree is not a prerequisite to testifying about the specific cause of an injury).  Indeed,

12  the Ninth Circuit has affirmed that specific causation testimony from biomechanics experts may

13  be recognized as a product of reliable principles and methods under Federal Rule of Evidence

14  702(c).  *Weber v. TMG Logistics, Inc*., 805 F. App'x 463, 466 (9th Cir. 2020).  As another court

15  in this circuit commented about Dr. Hayes himself, "[t]o the extent that plaintiff is arguing that

16  Hayes is not qualified to offer an opinion as to specific causation because he is not a medical

17  doctor, that argument fails."  *Allen,* 2016 WL 9086966, at *4*; see also Yu–Santos v. Ford Motor

18  Co., Civ. A*. No. 06–1773, 2009 WL 1392085, at *13 (E. D. Cal. May 14, 2009).  Moreover,

19  Hayes has extensive experience in clinical orthopedics, having served as a professor of

20  orthopedic surgery at multiple university hospitals where he "attended x-ray rounds, often on a

21  daily basis, offering input to residents and house staff on the mechanisms and treatment of

22  musculoskeletal injuries." (Dkt. No. 68-9 at 38.)  He has published prolifically in the field of

23  injury biomechanics and served as the founding editor of the Journal of Orthopedic Research.

24

1    (*Id.*)  Accordingly, Hayes has sufficient training, background, and experience to offer opinions

2    on specific causation.  *Allen,* 2016 WL 9086966, at *4, *Yu–Santos,* 2009 WL 1392085, at *13.

3            Next, Defendant argues that Dr. Hayes' opinions should be excluded as unreliable and

4    lacking in scientific methodology because he has not conducted or published research in the field

5    of WBV+S; because he "relies upon European standards, which have not been codified into law

6    in the United States"; and because he utilizes medical standards from 1997.  (Dkt. No. 63 at 5.)

7    The Court is not convinced.  First, "Rule 702 does not require an expert to publish articles . . . in

8    order to qualify to give expert testimony."  *Luttrell v. Novartis Pharms. Corp*., 894 F. Supp. 2d

9    1324, 1336 (E.D. Wash. 2012), aff'd, 555 F. App'x 710 (9th Cir. 2014).  Many experts base their

10   opinions on their knowledge and a review of peer reviewed medical or scientific literature.

11   *McClellan*, 710 F. Supp at 1117.  Next, Dr. Hayes' literature review on WBV+S extensively

12   catalogues peer reviewed papers from the past thirty years published both in the United States

13   and abroad.  (Dkt. No. 68-9 at 45) ("Some key review papers and epidemiological and medical

14   findings have been published.  For example, Dupuis, 1994; Magnusson et al., 1998; Teschke et

15   al., 1999; Bovenzi and Hulshof, 1999; Lings and Leboeuf-Yde, 2000; Griffin, 2004; Waters et

16   al., 2008; Johanning, 2011; Harris et al., 2012; Johanning, 2015; Bovenzi et al., 2017; Krajnak,

17   2018; Patterson et al., 2020; de la Hoz-Torres, 2021; and de la Hoz-Torres et al., 2023.").

18   Insofar as he relies on European scientific data and findings, there is no indication that the

19   science itself is suspect or lacking in evidentiary rigor.  Likewise, the 1997 standard for WBV as

20   described in the 1997 ISO guidelines recurs in the current literature as a basic method for

21   measuring WBV: there is no indication that it is now recognized as an unreliable method.  (Dkt.

22   No. 68-9 at 17.)

23

24

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 61) AND MOTION TO EXCLUDE (DKT. NO. 63) - 10

1    However, Dr. Hayes may not offer legal opinions—based on European standards or

2    otherwise.  *See United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (expert witness cannot

3    give an opinion as to his or her legal conclusion.)  Accordingly, Dr. Hayes' opinion that "based

4    on even a cursory review of the available literature on the causal role of Whole-Body Vibration

5    and spinal disorders," Defendant should have known that it was a "major issue" and taken steps

6    to reduce employee exposure is improper.  (*See* Dkt. No. 68-9 at 74.)  This opinion directly

7    pertains to an ultimate legal issue in this case: Defendant's negligence.  *C.f. Ditton v. BNSF Ry.*

8    *Co*., No. CV126932JGBJCGX, 2014 WL 12928305, *9 (C.D. Cal. Jan. 6, 2014).  Accordingly,

9    this opinion is excluded; Hayes shall not opine on Defendant's ultimate legal duties.[2]

10        3.  <u>Brian Hansen</u>

11    Brian Hansen worked for Union Pacific Railroad for twenty-one years, including as a

12    manager of track maintenance, a track supervisor, a system engineering supervisor, and as a

13    welding foreman.  (Dkt. No. 68-7 at 14–16.)  Hansen was "was qualified on FRA Part 213 Track

14    Safety Standards and was designated by Union Pacific Railroad as a qualified person to

15    supervise restorations and renewals of track and perform track inspections in accordance with

16    Union Pacific and Federal Railroad Administration (FRA) Track Safety Standards."  (*Id*. at 4.)

17    _____

18    [2] Additionally, Defendant asserts "[i]t is expected plaintiff will seek to supplement Dr. Hayes'
      opinions concerning the L5-S1 injury and allegedly related surgery for Mr. Morris and relate it to
19    his employment. However, Dr. Hayes does not mention any of this or give any opinion on this in
      his report. He should not be permitted to supplement at this late hour or testify to these issues at
20    trial." (Dkt. No. 63 at 13.)  Under Federal Rule of Civil Procedure 26(e), a party must
      supplement an expert report "in a timely manner if the party learns that in some material respect
21    the disclosure . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).  "Any additions or
      changes" to an expert report disclosed under Rule 26(a)(2)(B) "must be disclosed by the time the
22    party pretrial disclosures under Rule 26(a)(3)" are due.  Fed. R. Civ. P. 26(e)(2).  Rule 26(e)
      creates a duty to supplement—not a right. *Luke v. Family Care & Urgent Med. Clinics*, 323 F.
23    App'x 496, 500 (9th Cir. 2009). Plaintiff has not moved to supplement Dr. Hayes' report; should
      Plaintiff do so, the Court will consider the motion at that time. *See, e.g., Oracle Am., Inc. v.*
24    *Hewlett Packard Enter. Co*., No. 16-CV-01393-JST, 2019 WL 468809 (N.D. Cal. Feb. 6, 2019).

1    Hansen concludes, based on his "specialized knowledge and technical training as it relates to this

2    case and [his] experience in the railway industry," that Defendant "failed to ensure that Mr.

3    Morris was provided a reasonably safe work environment while moving and emptying and

4    shaking ballast railcars with a roadway maintenance machine."  (*Id*. at 12.)[3]  He further opines

5    that "BNSF Railway failed to comply with their own rules, policies, and standards of care that

6    are the custom and practice of the industry."  (*Id*.)

7         Defendant argues: "Hansen is a former Union Pacific Maintenance of Way employee

8    who, upon retirement, decided to call himself an expert" but "is not" qualified as one, and

9    therefore may not offer expert testimony.  (Dkt. No. 63 at 4.)  Defendant further asserts that

10   Hansen is not qualified to opine on causation or accident reconstruction and suggests his

11   opinions are improper legal conclusions.  (*Id*.)  The Court agrees that Hansen does not possess

12   the requisite expertise to opine on specific causation; however, causation is not the focus of his

13   report.  Hansen's 21 years of experience and technical training in track inspection, repair, and

14   railway safety *do* qualify him to provide testimony on the standards of care and safety that are

15   the custom and practice of the railroad industry. *See Ellenbecker v. BNSF Ry. Co*., No. 4:19-CV-

16   3038, 2021 WL 781384, *18 (D. Neb. Mar. 1, 2021) (admitting Hansen's expert report in a

17   railway injury case and noting that methodology like Hansen's has been found reliable in other

18   railroad cases); *Barnes v. Union Pac. R.R. Co.*, No. 5:19-CV-00027-RWS, 2020 WL 4355669,

19   *2 (E.D. Tex. Feb. 5, 2020) (finding Hansen's testimony sufficiently relevant and reliable to be

20   admissible under *Daubert*); *Zrowka v. BNSF Ry. Co*., No. CV-21-61-GF-BMM, 2023 WL

21

22   [3] In formulating his opinion, Hansen states he reviewed: the complaint; interrogatories and
     answers; requests for production and responses; the depositions of Plaintiff, McFall, and
23   Yothers; Plaintiff's statements; the BNSF Railway Personal Injury Report; Defendant's
     responses to Plaintiff's interrogatories; photographs; and dispatcher recordings.  (Dkt. No. 68-7
24   at 3.)

1    3412465, *8 (D. Mont. May 12, 2023) ("Mr. Hansen's expert report should be admitted, and his

2    testimony allowed at trial.").

3        Of course, "[a]n expert witness cannot give an opinion as to [his] legal conclusion, i.e., an

4    opinion on an ultimate issue of law." *Nationwide Transp. Fin. V. Cass Info Sys*., 523 F.3d 1051,

5    1058 (9th Cir. 2008). "When an expert 'purports to interpret [a statute] and opine as to whether it

6    was violated, this testimony is a 'legal conclusion' and is inappropriate for an expert to testify

7    to.'" *Zrowka,* 2023 WL 3412465, at *8 (quoting *Wells Fargo Bank, N.A. v. LaSalle Bank Nat.*

8    *Ass'n*, No. 2:08-CV-1448 JCM RJJ, 2011 WL 588471, *2 (D. Nev. Feb. 9, 2011)).  Accordingly,

9    the motion to exclude is granted as to Hansen's conclusion that Defendant failed to comply with

10   the FRA Part 214 Railroad Workplace Safety Standards.  *See Zrowka,* 2023 WL 3412465, at *8.

11   "Whether a party violated a federal regulation is a question of law and thus the subject of the

12   Court's instructions, not the subject of expert testimony." *Ellenbecker*, 2021 WL 781384, at

13   *18.  However, Hansen may refer to the FRA standards in describing part of the applicable

14   standard of care.  *Id*.  He may also opine on the safety environment.  *Id*.

15       Accordingly, the motion to exclude (Dkt. No. 63) is GRANTED IN PART and DENIED

16   IN PART as described herein.

17                    **IV    MOTION FOR SUMMARY JUDGMENT**

18       **A.  Legal Standard**

19       Summary judgment is proper only if the pleadings, the discovery and disclosure materials

20   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

21   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is

22   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

23   showing on an essential element of a claim in the case on which the nonmoving party has the

24

1    burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue

2    of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

3    for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

4    (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

5    metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a

6    material fact exists if there is sufficient evidence supporting the claimed factual dispute,

7    requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty

8    Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors

9    Association*, 809 F.2d 626, 630 (9th Cir. 1987).

10          The determination of the existence of a material fact is often a close question. The court

11    must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

12    e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect.

13    Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

14    of the nonmoving party only when the facts specifically attested by that party contradict facts

15    specifically attested by the moving party. The nonmoving party may not merely state that it will

16    discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

17    to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

18    Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not

19    be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

20    **B.  Discussion**

21    FELA provides:

22          Every common carrier by railroad while engaged in commerce between any of the
          several States . . . shall be liable in damages to any person suffering injury while he is

23          employed by such carrier in such commerce . . . for such injury . . . resulting in whole or
          in part from the negligence of any of the officers, agents, or employees of such carrier, or

24

by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.  FELA is not a workers' compensation statute; negligence forms the basis of employer liability.  *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994); *Ellis v. Union Pacific Ry. Co.*, 329 U.S. 649, 653, (1947).  Accordingly, a plaintiff bears the burden of providing duty, breach, causation, and damages.  *Allenbaugh v. BNSF Ry. Co.*, 832 F. Supp. 2d 1260, 1263 (E.D. Wash. 2011).  Under FELA, "a railroad employer owes its employees a duty to provide a safe place to work." *Allenbaugh,* 832 F. Supp. 2d at 1263 (citing *Atchison, T. & S.F. Railway Co. v. Buell*, 480 U.S. 557, 558 (1987)).  "A railroad breaches this duty when it fails to use ordinary care under the circumstances or fails to do what a reasonably prudent person would have done under the circumstances to make the working environment safe." *Id*. (citing *Tiller v. Atlantic C.L.R. Co.*, 318 U.S. 54, 67 (1943)).  Accordingly, "[t]he negligence inquiry focuses on what the carrier may have known about the risks, when the carrier knew that information, and what action or inaction would have been reasonable in light of those circumstances." *Jacobson v. BNSF Ry. Co.*, No. C18-1722JLR, 2021 WL 228895, *3 (W.D. Wash. Jan. 22, 2021).  Put simply, reasonable foreseeability of harm is the "essential ingredient of FELA negligence." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011) (internal quotations omitted).

The causation standard under FELA is far lower than in a typical tort claim.  A FELA plaintiff must show only that "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957).  Accordingly, although "FELA plaintiffs still must demonstrate some causal connection between a defendant's negligence and their injuries," it is undisputed that "the quantum of evidence sufficient to present a jury question of causation is less than it is in a common law tort action." *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994).

1    Thus, "[i]f negligence is proved . . . and is shown to have played any part, even the slightest, in

2    producing the injury, then the carrier is answerable in damages even if the extent of the injury or

3    the manner in which it occurred was not probable or foreseeable." *McBride*, 564 U.S. at 703

4    (cleaned up).  Finally, "[i]n FELA cases, the standard for summary judgment is liberally

5    construed in light of the strong federal policy in favor of letting juries decide cases arising under

6    FELA." *Curran v. Long Island R.R. Co.*, 161 F. Supp. 3d 253, 256 (S.D.N.Y. 2016) (internal

7    quotations removed).

8         Defendant asserts "BNSF is entitled to summary judgment dismissing this action because

9    Plaintiff cannot establish the breach and foreseeability elements of his FELA negligence claim."

10   (Dkt. No. 61 at 11.)  Defendant states that the swing loader was not defective—other than the

11   low tire—and accordingly asserts "BNSF did not breach its duty to provide reasonably safe

12   equipment, sufficient training, or a reasonably safe workplace with regard to the swing loader."

13   (*Id*. at 13.)  Defendant further suggests that while "Plaintiff . . . testified that BNSF should have

14   provided an alternative way to unload rock cars . . . he has not identified any actual alternative,"

15   and argues "there is no alternative, safer way to empty the rock cars."  (*Id*.)  Finally, Defendant

16   argues that because Plaintiff "testified he never knew prior to February 3, 2020 that hauling and

17   emptying rock cars could or would cause his acute injury . . . he cannot establish the

18   notice/foreseeability element of his FELA claim."  (*Id*. at 14.)

19        Plaintiff responds "[t]here is more than sufficient evidence to create a genuine issue of

20   material fact as to whether BNSF provided a reasonably safe workplace."  (Dkt. No. 67 at 7–8.)

21   Plaintiff's railroad expert states that a swing loader is "just not designed" to dump ballast in the

22   manner prescribed by Defendant (Dkt. No. 68-4 at 5); accordingly, Plaintiff argues "the evidence

23

24

1    demonstrates that BNSF directed Morris (and other employees) to use a work process that

2    required him to operate equipment in an unintended and unsafe manner." (*Id*. at 9.)

3        The Court agrees that "a reasonable factfinder could find that BNSF breached its duty to

4    ensure that its workers were reasonably protected from injury resulting from operation" of

5    repeatedly rearending the railcar into the swing loader; a process the swing loader was not

6    designed to do. *See Ditton*, 2013 WL 2241766, at *17 (denying summary judgment because a

7    jury could determine BNSF should have supplied the plaintiff with equipment "to perform his

8    task with reasonable safety."). Defendant cites no authority for the proposition that a Plaintiff

9    must identify an alternative work method to prevail on summary judgment—indeed, this

10   argument has been rejected by courts in this circuit. *Allenbaugh*, 832 F.Supp.2d at 1265.[4]

11       Additionally, Defendant's argument that Plaintiff cannot establish foreseeability because

12   *he* did not know that the ballast dumping process would cause acute injury misunderstands the

13   legal requirement. (Dkt. No. 61 at 14.) The legal issue is whether the *defendant* employer knew

14   or should have known that that a particular condition could reasonably result in a "mishap and

15   injury"—not the plaintiff. *McBride*, 564 U.S. at 703. As the Ninth Circuit has put it, "[t]he test

16   of foreseeability [in FELA actions] does not require that the *negligent person* should have been

17

18   ───────────────

     [4] As the *Allenbaugh* court put it: "BNSF asserts that Plaintiff has not and cannot demonstrate any

19   deviation from industry practice by BNSF with respect to Plaintiff's work environment, and
     Plaintiff has not and cannot point to any alternative work methods or equipment used by any

20   other Class I railroad during the time Plaintiff was working that are proven to be "safe" as
     compared to BNSF's methods and equipment. While it may be that industry practice is a relevant

21   consideration in the determination of whether BNSF's work environment was reasonably safe, it
     is not dispositive. Put another way, just because BNSF was essentially doing what every other

22   Class I railroad was doing in terms of ergonomics in the workplace does not necessarily mean
     BNSF was providing a reasonably safe workplace. A jury should decide whether the risks that

23   were not assessed by BNSF were unsafe, or whether those risks could have reasonably been
     avoided in light of the normal requirements of a trainman's job." *Allenbaugh*, 832 F.Supp.2d at

24   1265.

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 61) AND MOTION TO EXCLUDE (DKT.
NO. 63) - 17

1    able to foresee the injury in the precise form in which it in fact occurred.  Rather, it is sufficient

2    if the *negligent person* might reasonably have foreseen that an injury might occur." *Armstrong*

3    *v. Burlington N. R. Co*., 139 F.3d 1277, 1279 (9th Cir. 1998) (quoting *Mullahon v. Union Pac.*

4    *R.R.*, 64 F.3d 1358 (9th Cir.1995) (emphasis added).  Here, there is sufficient evidence to create

5    a genuine dispute of material fact as to whether Defendant failed to "do what a reasonably

6    prudent person would have done under the circumstances to make the working environment

7    safe." *Allenbaugh,* 832 F. Supp. 2d at 1263.  Likewise, whether Defendant might reasonably

8    have foreseen that injury would stem from the rearending ballast dumping procedure is a

9    question for the jury.  A reasonable jury could find the rearending method represents

10   'circumstances which a reasonable person would foresee as creating a potential for harm.'"

11   *Jaeger v. BNSF Ry. Co*., No. 23-CV-00930-RAJ, 2024 WL 3521606, *5 (W.D. Wash. July 24,

12   2024) (quoting *LeDure v. Union Pacific R.R. Co*., 962 F.3d 907, 910 (7th Cir. 2020)).

13          Finally, Defendant suggests Plaintiff's claim is barred by the statute of limitations

14   because "while plaintiff did not know the specific mechanism of his back pain and injury, as

15   early as 2015 he did know that his job was causing him back pain and doing some injury."  (Dkt.

16   No. 61 at 19.)  Under FELA, "[n]o action shall be maintained . . . unless commenced within three

17   years from the day the cause of action accrued." 45 U.S.C. § 56.  A cause of action accrues under

18   FELA either at the time of the specific incident or—if the injury is the result of ongoing

19   exposure—when the plaintiff knew or in the exercise of reasonable diligence should have known

20   about the injury and its cause.  *Sponcler v. BNSF Ry. Co*., No. 2:19-CV-00286-SMJ, 2021 WL

21   798880, *4 (E.D. Wash. Jan. 6, 2021). In this case, the injury occurred on February 3, 2020 and

22   Plaintiff filed this action on January 23, 2023—within the three year statute of limitations.  Here,

23   there is no indication that Plaintiff had constructive knowledge of his injury or its cause prior to

24

February 3, 2020.  The fact that his back hurt off and on between 2015 and 2020 does not start the clock and bar him from recovery; "[t]he simple reality is that manual labor causes aches and pains" and it is not reasonable to assume he would have brought suit for what was "widely considered a normal part of work."  *See Anderson v. BNSF Ry.*, 354 P.3d 1248, 1260 (Mont. 2015); *see also Kattenbraker v. Union Pac. R. Co*., No. 09-CV-0927-MJR-PMF, 2010 WL 1997948, *4 (S.D. Ill. May 18, 2010).

    Defendant's motion for summary judgment is DENIED.

## V    CONCLUSION

    Accordingly, the motion to exclude (Dkt. No. 63) is GRANTED IN PART and DENIED IN PART as described herein.  The motion for summary judgement (Dkt. No. 61) is DENIED.


    Dated this 7th day of July, 2025.


    David G. Estudillo
    United States District Judge

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 61) AND MOTION TO EXCLUDE (DKT. NO. 63) - 19